IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WHM MINERAL HOLDINGS, L.L.C., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2817 |
| | § | |
| BOCOOK ENGINEERING, INC. | § | |
| and J. R. SALYERS, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

WHM Mineral Holdings, L.L.C. ("WHM") brings this action against Bocook Engineering, Inc. ("Bocook") and J. R. Salyers alleging negligence, professional malpractice, breach of fiduciary duty, and fraud concerning certain representations that Bocook and Salyers allegedly made about the coal reserves in a mine subsequently purchased by WHM. Pending before the court is Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and for Improper Venue or, in the Alternative, to Transfer Venue (Docket Entry No. 6). Without deciding defendants' motion to dismiss, for the reasons explained below, the court will grant defendants' motion to transfer this action to the United States District Court for the Eastern District of Kentucky.

## I. Background

This action concerns certain representations that Salyers and Bocook allegedly made about coal reserves in Martin County, Kentucky, that were subsequently purchased by WHM. Defendant

Salyers is an individual residing in Staffordsville, Kentucky.[1]
Defendant Bocook is a professional engineering company incorporated
in Kentucky with its principal place of business in Paintsville,
Kentucky.[2]  WHM is a Delaware corporation with its principal place
of business in Houston, Texas.[3]

In 2003 and 2005 Eastern Consolidated Energy, Inc. ("Eastern
Consolidated"), a company that held partial ownership of the coal
reserves in Martin County prior to the events giving rise to this
litigation, hired Bocook to estimate the amount of coal reserves in
specified areas of Martin County.[4]  Salyers performed the analyses
for two studies in Kentucky, and sent reports to Eastern
Consolidated's office in Bevinsville, Kentucky.[5]  Defendants have
produced a letter dated October 7, 2003, informing Eastern
Consolidated that certain specified areas contain total coal
reserves of 41,530,909 raw tons in place.[6]  Defendants have also
produced a letter dated August 5, 2005, informing Eastern

---

[1]Affidavit of J. R. Salyers, Exhibit 11 to Defendants' Motion
to Dismiss for Lack of Personal Jurisdiction and for Improper Venue
or, in the Alternative, to Transfer Venue ("Defendants' Motion"),
Docket Entry No. 6, ¶ 2.

[2]Plaintiff's Original Complaint, Docket Entry No. 1, ¶ 3.

[3]Id. ¶ 1.

[4]Affidavit of Dewey Bocook, Exhibit 10 to Defendants' Motion,
Docket Entry No. 6, ¶ 2.

[5]Id.

[6]Letter from Bocook Engineering to Eastern Consolidated, dated
October 7, 2003, Exhibit 1 attached to Defendants' Motion, Docket
Entry No. 6.

Consolidated that the reserves for the same regions total 15,816,129 raw tons in place, but noting that the calculations were based in part on a "Lease boundary map, supplied by Eastern Consolidated Energy, Inc."[7]   Defendants state that the substantially different totals in the 2003 and 2005 letters reflect different analyses, the first considering total reserves in the specified regions, while the second was limited only to coal reserves within Eastern Consolidated's lease boundaries.[8]

By December of 2007 Eastern Consolidated, Consolidated Energy, Inc., and related entities with an ownership interest in the coal reserves had filed for bankruptcy in the Eastern District of Kentucky, and as a result the bankruptcy estate offered the coal reserves in Martin County for sale.  William H. Murphy, a member and manager of WHM, states that "WHM was formed for the purpose of purchasing and operating the Warfield, Martin County, Kentucky mine and related coal processing facility."[9]   Murphy states that in November of 2007 he was approached by Kevin Davis of Vulcan Capital, a venture capital firm based in New York, about a possible

_____

[7]Letter from Bocook Engineering to Eastern Consolidated, dated August 5, 2005, Exhibit 2 attached to Defendants' Motion, Docket Entry No. 6.

[8]Defendants' Motion, Docket Entry No. 6, pp. 2-3.

[9]Affidavit of William H. Murphy, Exhibit 1 attached to Plaintiff's Response to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and for Improper Venue, or in the Alternative, to Transfer Venue ("Plaintiff's Response"), Docket Entry No. 7, ¶ 3.

purchase of the coal reserves.[10]  Murphy discussed financing the

purchase with PlainsCapital Bank, a bank based in Dallas, Texas.[11]

Regarding the negotiations leading up to the purchase, Murphy's

affidavit states:

> 5.   Afterwards, I and/or Kevin Davis communicated with
> a representative for the bankruptcy estate offering the
> coal reserves for sale that WHM had preliminary interest
> in purchasing the coal reserves.  WHM was then sent
> information concerning the coal reserves by Dean Langdon,
> trustee for the bankruptcy estate and Joseph Jacobs,
> president of Consolidated Energy, Inc., the seller, for
> purposes of conducting due diligence on the transaction.
> After reviewing the information, myself, Kevin Davis and
> Alan White, Jerry Schaffner and Thomas Ricks, all with
> PlainsCapital Bank, traveled to Kentucky to physically
> inspect the coal reserves and discuss with
> representatives from the bankrupt companies and their
> engineers details about the coal reserves.  I do not
> recall at this time if any representative from BOCOOK
> and/or SALYERS were present during any of these
> discussions and/or meetings in Kentucky.  However, it was
> communicated to us while we were in Kentucky that the
> coal reserves had 41 million plus raw tons of coal in
> place and we were provided reports and/or studies which
> appeared to support the amount.  Upon returning to Texas
> and after further discussions with PlainsCapital Bank
> regarding financing, WHM decided to purchase the coal
> reserves.
>
> 6.   Prior to PlainsCapital Bank funding the purchase
> price, Thomas Ricks, at the bank, requested that WHM
> obtain an updated confirmation for the represented 41
> million plus raw tons of coal existing within the coal
> reserves.  Kevin Davis acted as the intermediary between
> WHM and the bankrupt companies and he assisted in getting
> . . . the update from the bankrupt entities.  On and
> about December 20, 2007, WHM received the letter written
> by BOCOOK and SALYERS by email from Vulcan confirming
> 41,530,909 raw tons of coal in place, within the coal
> reserves along with attached information from a

---

[10]Id. ¶ 4.

[11]Id.

-4-

referenced reserve report dated October 7, 2003. . . .
After receiving the letter and accompanying documents it
was forwarded to Thomas Ricks at PlainsCapital Bank for
its files.   The closing for the purchase of the coal
reserves in the amount of $3,125,000.00 closed on and
about December 27, 2007 and PlainsCapital Bank funded the
purchase price.

7.   Afterwards, WHM spent several months tying up loose
ends associated with the purchase of the coal reserves
and eventually secured a potential buyer for the coal
reserves in and around April/May of 2008.   The potential
buyer was Carpenter Creek, LLC (hereinafter Carpenter
Creek) which was a Montana Company with offices in
Dallas, Texas.     During its due diligence for the
potential purchase of the coal reserves, it requested
confirmation from BOCOOK for the available coal within
the coal reserves.    In response, BOCOOK and SALYERS
provided it a letter dated May 19, 2008, which stated the
raw tons of coal in place for the coal reserves were
15,816,129, citing a reserve study prepared on August 5,
2005. . . . Upon receipt of the letter, Carpenter Creek
backed out of the purchase due to the significant
difference between the raw tons of coal in place reported
by BOCOOK and SALYERS in the letter of December 20, 2007
compared with the total from the letter by BOCOOK and
SALYERS of May 19, 2008.[12]

In support of the affidavit WHM has provided copies of the

December 20, 2007, and May 19, 2008, letters.[13]  Both letters are

on Bocook stationery, showing an address in Paintsville, Kentucky,

and are signed by J. R. Salyers.  The December 20, 2007, letter is

addressed to "Dear Sir," without any further information about the

intended recipient.   The May 19, 2008, letter is addressed to

Carpenter Creek, LLC in Billings, Montana.  Neither letter mentions

Murphy, WHM, or Texas in any way.

---

[12]<u>Id.</u> ¶¶ 5-7.

[13]Exhibits A and B to Affidavit of William H. Murphy, Exhibit 1
attached to Plaintiff's Response, Docket Entry No. 7.

WHM also provides an affidavit by Kevin Davis of Vulcan Capital.[14]  The affidavit states:

> Myself and William Murphy, along with several representatives from PlainsCapital Bank in Texas traveled to Kentucky to physically inspect the coal reserves . . . Once it was decided that WHM wanted to proceed forward with the purchase of the coal reserves PlainsCapital Bank requested an updated confirmation of coal in place within the coal reserve area.  I talked with William Murphy and Alan White at PlainsCapital Bank and about the information needed.  Rob Chmiel [CFO of Consolidated Energy, Inc.] was asked to obtain the confirmation. . . Rob talked to Joe Jacobs [President of Consolidated Energy] about getting the information requested by the bank.  Upon information and belief, Joe Jacobs contacted BOCOOK and SALYERS to obtain bring down report [sic].  A short time later, William Murphy and I then received an email from Rob, on and about December 20, 2007, containing the letter from BOCOOK and SALYERS . . .[15]

While there is some dispute among the parties regarding exactly what the defendants represented about the coal reserves in December of 2007, no party has alleged that there were any direct communications between WHM and Bocook about the coal reserves.  WHM and PlainsCapital Bank asked Kevin Davis, who asked Rob Chmiel, who asked Joe Jacobs, who asked Bocook and Salyers to confirm the amount of the coal reserves.  The December 20, 2007, letter presumably returned to WHM along the same attenuated path.  All of these communications apparently occurred while the parties were located in Kentucky.

---

[14]Affidavit of Kevin Davis, Exhibit 2 attached to Plaintiff's Response, Docket Entry No. 7.

[15]Id. ¶ 4.

-6-

The most significant communications for this action were those that took place between Jacobs and Bocook leading up to the December 20, 2007, letter, which WHM and PlainsCapital Bank allegedly relied on in proceeding with the purchase of the coal reserves.  Regarding these communications, Bocook states that in December of 2007 Jacobs requested information about the coal reserves, and on December 17, 2007, Salyers sent Jacobs a letter providing the results from the 2005 study estimating 15,816,129 raw tons in place.[16]  This letter, which Bocook has produced, states that because only sixty percent of the raw tons in place are likely to be recoverable, and because approximately 230,000 tons had been mined from the region since the 2005 study, the remaining recoverable tons in place was estimated in 2007 to be 9,159,950 tons.[17]  It is not clear whether WHM ever saw this letter prior to its purchase of the coal reserves.  Upon further requests from Jacobs, Bocook sent letters to Jacobs on December 18 and 19, 2007, discussing the details that went into the 2003 and 2005 studies.[18]  Finally, upon an additional request from Jacobs, Salyers sent the December 20, 2007, letter, which begins, "On October 7, 2003, Bocook Engineering Inc issued the following reserve report on the

---

[16]Letter from J. R. Salyers to Eastern Consolidated, dated December 17, 2007, Exhibit 3 to Defendants' Motion, Docket Entry No. 6.

[17]Id.

[18]Exhibits 4 and 5 to Defendants' Motion, Docket Entry No. 6.

-7-

referenced areas," and then states the numbers for raw tons in place, which total 41,530,909 tons.[19]  The December 20, 2007, letter appears to be the only one of the four letters Salyers sent to Jacobs between December 17 and December 20 that Jacobs forwarded to WHM.  Since both Jacobs and Salyers are based in Kentucky, it appears that all of the communications regarding these letters occurred while both parties were in Kentucky.

WHM filed suit against Bocook and Salyers on August 31, 2009, alleging negligence, professional malpractice, breach of fiduciary duty, and fraud (Docket Entry No. 1).  On October 30, 2009, Bocook and Salyers moved to dismiss the action for lack of personal jurisdiction or, in the alternative, to transfer venue (Docket Entry No. 6).  WHM argues that this court possesses personal jurisdiction over the defendants, but requests that if the court does not find personal jurisdiction, the court transfer the action to a United States District Court in Kentucky rather than dismissing it (Docket Entry No. 7).

## II.  <u>Analysis</u>

The court will rule on defendants' motion to transfer without ruling on defendants' motion to dismiss for lack of personal jurisdiction.  This course is appropriate because a district court can transfer an action when it has personal jurisdiction if such a

---

[19]Letter from J. R. Salyers, December 20, 2007, Exhibit 6 attached to Defendants' Motion, Docket Entry No. 6.

transfer will be "in the interest of justice." 28 U.S.C. § 1404(a) (2009). Likewise, when a court finds that it lacks jurisdiction, it may dismiss the action or transfer it to any court in which the action could have been brought at the time it was filed if it is in the interests of justice to do so. See Christianson v. Colt Industries Operating Corp., 108 S.Ct. 2166, 2178-79 (1988) (recognizing that once a court determines that it lacks subject matter jurisdiction it may either dismiss the action or transfer it to a court that has jurisdiction). See also Hayes v. Gulf Oil Corp., 821 F.2d 285, 291 (5th Cir. 1987) (same). Because the court concludes that a transfer is in the interests of justice, it will grant the motion to transfer without deciding the motion to dismiss.

## A.   Defendants' Motion to Transfer -- Applicable Law

Section 1404(a) allows district courts to transfer an action to another proper venue "for the convenience of parties and witnesses" if such a transfer will be "in the interest of justice." 28 U.S.C. § 1404(a) (2009). The preliminary question under § 1404(a) is whether a civil action might have been brought in the proposed venue. In re Volkswagen of America, Inc., 545 F.3d 304, 312 (5th Cir. 2008). Whether a venue is proper is determined under 28 U.S.C. § 1391 when no special, restrictive venue statute applies. Id. If venue in the proposed district would have been proper, the court must then determine "whether a § 1404(a) venue

transfer is for the convenience of parties and witnesses and in the interest of justice." Id. at 315.  The Fifth Circuit has noted that because a plaintiff's choice of forum should bear some weight in a transfer analysis, the movant must show "good cause" in order to obtain a transfer.  Humble Oil & Ref. Co. v. Bell Marine Serv., Inc., 321 F.2d 53, 56 (5th Cir. 1963).  To show "good cause" the movant must show that the desired venue is "clearly more convenient" than the venue chosen by the plaintiff:

> [W]hen the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected.  When the movant demonstrates that the transferee venue is clearly more convenient, however, it has shown good cause and the district court should therefore grant the transfer. In re Volkswagen, 545 F.3d at 315.

The Fifth Circuit has provided a non-exclusive list of private and public interest factors, none of which are given dispositive weight, for courts to use in determining whether a given venue is "clearly more convenient" than another.  Id.  The private interest factors include (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive.  Id.  The public interest factors include:  (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with

the law that will govern the case; and (4) the avoidance of
unnecessary problems of conflict of laws and of the application of
foreign law.   Id.

**B.   Venue in the Eastern District of Kentucky Would Be Proper**

The preliminary question in considering defendants' transfer
motion  is whether the action could properly have been brought in
the Eastern District of Kentucky.   See In re Volkswagen, 545 F.3d
at 312.   The relevant venue statute provides that venue is proper
in "a judicial district in which a substantial part of the events
or omissions giving rise to the claim occurred, or a substantial
part of property that is the subject of the action is situated."
28 U.S.C. § 1391(a) (2009).

The court concludes that a substantial part of the events or
omissions giving rise to the claim occurred in eastern Kentucky.
The coal reserves in Martin County and the towns of Paintsville
(headquarters of Bocook), Staffordsville (home of Salyers), and
Betsy Layne (headquarters of Eastern Consolidated Energy, Inc.) are
all located in eastern Kentucky.   WHM's claims concern analyses and
representations made in Kentucky about coal reserves in  Kentucky.
All actions and omissions by Bocook and Salyers that could be
relevant to the action occurred in eastern Kentucky.   The relevant
communications between WHM, Davis, Jacobs, and Bocook all occurred
while those parties were located in Kentucky.   Therefore, the court
concludes that under 28 U.S.C. § 1391(a) venue for this action
would be proper in the Eastern District of Kentucky.

-11-

## C.   The Private Interest Factors

The private interest factors that courts must consider regarding the convenience of parties and witnesses are:  (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive.  In re Volkswagen, 545 F.3d at 315.

The factor concerning relative ease of access to sources of proof clearly supports transfer.  WHM's claims concern studies and representations made by Bocook and Salyers entirely in Kentucky, concerning coal reserves in Kentucky.  Bocook's records regarding those studies and any records of communications between Bocook and Consolidated Energy about those studies are most likely located in Kentucky.  While this action does not name any representatives of Eastern Consolidated or the other bankrupt entities as defendants, the representatives of the bankrupt entities played a large role in communicating the results of Bocook's studies to WHM, and therefore the records of these bankrupt companies are highly relevant to this action.  Since Eastern Consolidated was located in Kentucky, there will likely be greater ease of access to Eastern Consolidated's records in Kentucky than in Texas.  While WHM's and PlainsCapital Bank's records are probably more easily accessible in Texas than in Kentucky, they are less relevant because this action is primarily

concerned with the actions and omissions of Bocook and Salyers, and neither WHM nor PlainsCapital Bank had any contractual relationship or direct communications with Bocook and Salyers during the relevant period.  The court concludes, therefore, that the majority of relevant sources of proof are located in Kentucky.

The second factor is neutral since neither party has presented any evidence that the availability of compulsory process to secure the attendance of witnesses is an issue in this action.

The third factor, concerning the cost of attendance for willing witnesses, favors transfer.  Bocook has presented an affidavit identifying four key witnesses located in Kentucky:  Joe Jacobs from Eastern Consolidated; Carol Robinson, an employee of Bocook's in accounting who can testify that Bocook received no work orders from WHM during the relevant period; Kelly Osborne, the Bocook draftsman who made the drawings and maps of the coal reserves; and Debra McKenzie, the Bocook receptionist who delivered the reserve reports to Eastern Consolidated's office in Kentucky.[20] It is likely that testifying in Kentucky would be less expensive than testifying in Texas for any other employees of Bocook or the bankrupt entities who possess information about the relevant transactions.  Kevin Davis of Vulcan Capital is based in New York, so it is not clear whether testifying in Kentucky or Texas would be

---

[20]Affidavit of Dewey Bocook, Exhibit 10 to Defendants' Motion, Docket Entry No. 6, ¶ 9.

less costly to him.   Testifying in Texas would likely be less expensive than testifying in Kentucky for representatives of WHM and PlainsCapital Bank, but the testimony of any such representatives would be fairly limited because neither WHM nor PlainsCapital Bank had any direct interactions with Bocook or Salyers during the relevant period.   The court concludes, therefore, that the majority of witnesses possessing information relevant to this action are located in Kentucky, and thus the third factor favors transfer.

The fourth factor concerns all other practical problems that make trial of a case easy, expeditious, and inexpensive.  The court first notes that in general it is probably more expeditious for a court in Kentucky to resolve a dispute about what someone in Kentucky said about a Kentucky coal mine than it would be for a court in Texas to resolve the same dispute.  Second, the court notes that while the defendants have conducted no business in Texas, WHM has shown a willingness to travel to Kentucky to pursue the transactions underlying this litigation.  The court concludes, therefore, that WHM may be willing to travel there again if it wishes to pursue this litigation.  The court concludes that the fourth factor generally supports transfer.

## D.   The Public Interest Factors

Courts consider the following public interest factors in determining whether to grant a venue transfer: (1) the

-14-

administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws and of the application of foreign law.  In re Volkswagen, 545 F.3d at 315.

Because neither party has presented any evidence concerning the relative congestion of the two judicial districts, the court concludes that the first factor is neutral.

The second factor strongly favors transfer.  Coal mining and the industries that support it are of far greater local interest in eastern Kentucky than they are in southern Texas.  The relevant coal reserves are in Kentucky, the bankrupt entities that sold the coal reserves were or are located in Kentucky, and Bocook and its employees are all located in Kentucky.  WHM's out-of-state investment, by contrast, holds little local interest in Texas because it involves no employees, business operations, or physical assets in Texas.  The court concludes that the factor of local interests supports transfer.

The third factor considers the familiarity of the forum with the law that will govern the case.  Without deciding which law governs the dispute, the court concludes that Kentucky law most likely governs.  A federal court sitting in diversity applies the conflict-of-laws rules of the state in which it sits.  Vasquez v. Bridgestone/Firestone, Inc., 325 F.3d 665, 674 (5th Cir. 2003).

-15-

Texas applies the "most significant relationship" test, which considers various contacts:  the place where the injury occurred, the place where the injury-causing conduct occurred, the parties' residence, and the place where the relationship, if any, between the parties is centered.  Id., citing Gutierrez v. Collins, 583 S.W.2d 312, 318-19 (Tex. 1979).  In this action, assuming that the "injury" was WHM's purchase of the coal reserves at too high of a price, the injury occurred in Kentucky, the actions giving rise to the injury occurred in Kentucky, the defendants and most of the third-party witnesses reside in Kentucky, and to the extent that WHM and Bocook had a relationship, that relationship was centered in Kentucky.  Therefore, under the "most significant relationship" test a court would almost certainly apply Kentucky law.  A court in Kentucky will be more familiar with Kentucky law than would be a court in Texas.  Therefore, this factor supports transfer.

The fourth factor considers the avoidance of unnecessary problems of conflict of laws and of the application of foreign law. The court is unaware of any considerations relevant to this factor other than those discussed above concerning the choice of law governing this dispute, which appear to favor the application of Kentucky law.  Therefore, to the extent that this factor is relevant it favors transfer.

## E.  Conclusion

Multiple factors support, and no factors argue against, transferring this action to the Eastern District of Kentucky.  The

-16-

court concludes, therefore, that Bocook and Salyers have demonstrated that the Eastern District of Kentucky is clearly more convenient than is the Southern District of Texas, and thus have shown good cause for granting transfer.

### III.   Conclusion and Order

For the reasons stated above, the court concludes that transfer to the United States District Court for the Eastern District of Kentucky is appropriate under 28 U.S.C. § 1404(a). Because the court is granting defendants' motion to transfer, defendants' motion to dismiss for lack of personal jurisdiction and for improper venue is moot. Accordingly, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and for Improper Venue or, in the Alternative, to Transfer Venue (Docket Entry No. 6) is **GRANTED in part** as to the transfer of venue. This action is **TRANSFERRED** to the United States District Court for the Eastern District of Kentucky at Pikeville.

**SIGNED** at Houston, Texas, on this 22nd day of December, 2009.

_____

SIM LAKE
UNITED STATES DISTRICT JUDGE

-17-